07-CV-00876-CMP



FILED
LODGED
ENTERED
RECEIVED

JUN 07 2007   DB

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE
DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

CHRISTOPHER LARSON and JULIA
CALHOUN,

    Plaintiffs,

        v.

LYDIAN WEALTH MANAGEMENT
HOLDINGS COMPANY; LYDIAN
WEALTH MANAGEMENT
COMPANY, LLC; LYDIAN
SECURITIES COMPANY, LLC;
LYDIAN TRUST COMPANY;
CONVERGENT WEALTH ADVISORS;
and CITY NATIONAL
CORPORATION,

    Defendants.

**C07 - 0876 JCC**

COMPLAINT

Plaintiffs Christopher Larson and Julia Calhoun, through their undersigned counsel,

hereby allege as their Complaint against defendants Lydian Wealth Management Holdings

Company, Lydian Wealth Management Company, LLC, Lydian Securities Company, LLC,

Lydian Trust Company, Convergent Wealth Advisors and City National Corporation as

follows:

COMPLAINT
Page 1

**YARMUTH WILSDON CALFO PLLC**

FOURTH & MADISON
925 FOURTH AVENUE, SUITE 2600
SEATTLE WASHINGTON 98104
T 206.516.3800   F 206.516.3888

1

**BACKGROUND**

2      1.      This action arises out of misrepresentations perpetrated by defendants and

3   their principals as a result of their dealings with high-net-worth individuals.  Representing

4   themselves as having exceptional financial acumen and extensive skill and experience in

5   advising wealthy clients in connection with the purchase from global banking institutions of

6   highly complex and esoteric investment products--in this case a particularly complex

7   variation of an equity derivative investment product--defendants charged millions of dollars

8   in consulting fees.  These rather high fees were claimed to be justifiable based on

9   defendants' misrepresentations that they possessed the skills and experience to design and

10  negotiate investment parameters with the global banks that were tailored to their clients'

11  specifically identified investment objectives.

12     2.      In actual fact, however, defendants were lacking in the expertise required to

13  evaluate the financial consequences of the investment products they advised plaintiffs to

14  purchase.  As a result, they exposed plaintiffs to nearly $50 million of losses and caused

15  them to suffer nearly $10 million of actual losses.  After all the damage had been done,

16  defendants' representative with principal responsibility for the design and negotiation of the

17  transactions at issue made the following remarkable admission as to his lack of expertise

18  and failure--and indeed inability--to protect plaintiffs' interests:

19  
20  
21  
22  
23

> **What I do not have are pricing models, because that is not the nature of our business.  Neither do I have trading experience.**  These factors, combined with a generally positive professional relationship with [the counterparty-bank] for six years, **resulted in me accepting at face value what they told me with respect to your transaction and "market standards."**  (emphasis added).

24  Plaintiffs paid defendants more than $2.3 million for these "expert consulting services" and

25  were deprived of $7,280,000 in the process.

26

COMPLAINT
Page 2

1

**PARTIES**

2      3.     Plaintiffs Christopher Larson and Julia Calhoun are both natural persons and

3 citizens of the State of Washington, and reside in Shoreline, Washington.

4      4.     Upon information and belief, defendant Lydian Wealth Management

5 Holdings Company is a corporation duly organized and existing under the laws of the State

6 of Maryland with its principal place of business located at 2600 Tower Oaks Boulevard,

7 Suite 300, Rockville, Maryland 20852, and additional offices located in this judicial district

8 at 2415 Carillon Point, Kirkland, Washington 98033. Upon information and belief, Lydian

9 Wealth Management Holdings Company is the successor to Lydian Financial Holdings

10 Company and, prior to that, CMS Financial Holdings Company, Inc. Upon further

11 information and belief based on recent public statements concerning the acquisition of the

12 assets of Lydian Wealth Management Holdings Company by City National Corporation,

13 Lydian Wealth Management Holdings Company either has changed or will soon change its

14 name to Convergent Wealth Advisors. As a result, Convergent Wealth Advisors either is or

15 may be a legal successor in interest to Lydian Wealth Management Holdings Company.

16      5.     Upon information and belief, defendant Lydian Wealth Management

17 Company, LLC is a limited liability company duly organized and existing under the laws of

18 the State of Maryland with its principal place of business located at 2600 Tower Oaks

19 Boulevard, Suite 300, Rockville, Maryland 20852, and additional offices located in this

20 judicial district at 2415 Carillon Point, Kirkland, Washington 98033. Upon information and

21 belief, defendant Lydian Wealth Management Company, LLC is the successor to Naidyl

22 Wealth Management, LLC, and prior to that Capital Management Strategies Financial

23 Services, Inc. At all relevant times, Lydian Wealth Management Company, LLC and its

24 predecessors have registered as investment advisors pursuant to the Investment Advisors

25 Act of 1940. Upon further information and belief based on recent public statements

26 concerning the acquisition of the assets of Lydian Wealth Management Company, LLC by

COMPLAINT
Page 3

1     City National Corporation, Lydian Wealth Management Company, LLC either has changed

2     or will soon change its name to Convergent Wealth Advisors. As a result, Convergent

3     Wealth Advisors either is or may be a legal successor in interest to Lydian Wealth

4     Management Company, LLC.

5           6.      Upon information and belief, defendant Lydian Securities Company, LLC is

6     a limited liability company duly organized and existing under the law of the State of

7     Maryland with its principal place of business located at 2600 Tower Oaks Boulevard, Suite

8     300, Rockville, Maryland 20852, and additional offices located in this judicial district at

9     2415 Carillon Point, Kirkland, Washington 98033. Upon information and belief, defendant

10     Lydian Securities Company, LLC is the successor to Naidyl Securities, LLC, and prior to

11     that CMS Securities Inc. Upon further information and belief based on recent public

12     statements concerning the acquisition of the assets of Lydian Securities Company, LLC by

13     City National Corporation, Lydian Securities Company, LLC either has changed or will

14     soon change its name to Convergent Wealth Advisors. As a result, Convergent Wealth

15     Advisors either is or may be a legal successor in interest to Lydian Securities Company,

16     LLC.

17           7.      Upon information and belief, defendant Lydian Trust Company is a

18     corporation duly organized and existing under the laws of the State of Florida with its

19     principal place of business located at 3801 PGA Blvd., Suite 700, Palm Beach Gardens,

20     Florida 33410. Upon further information and belief, Lydian Trust Company directly or

21     indirectly owns and controls the affairs of the Lydian defendants identified in Paragraphs 4-

22     6. Upon further information and belief, the assets of the Lydian defendants identified in

23     Paragraphs 4-6 were transferred to a newly created entity which was in turn acquired by

24     Lydian Trust Company without fair consideration, and the ownership interest in such newly

25     created entity was subsequently sold by Lydian Trust company to City National

26     Corporation, with the result that the Lydian Trust Company received all or substantially all

COMPLAINT
Page 4

**YARMUTH WILSDON CALFO PLLC**
FOURTH & MADISON
925 FOURTH AVENUE, SUITE 2500
SEATTLE WASHINGTON 98104
T 206.516.3800   F 206.516.3888

1    of the consideration for the assets of the Lydian defendants identified in Paragraphs 4-6
2    above, and such Lydian defendants have been stripped of all or substantially all their assets
3    and will, upon information and belief, thus be unable to satisfy any Judgment that may be
4    entered against them in this action.

5         8.     Lydian Wealth Management Holdings Company is, upon information and
6    belief, the sole member of defendants Lydian Wealth Management Company, LLC and
7    Lydian Securities Company, LLC. Upon information and belief, at all relevant times,
8    defendants Lydian Wealth Management Company, LLC and Lydian Securities Company,
9    LLC have been affiliates of each other and of defendant Lydian Wealth Management
10   Holdings Company. Upon further information and belief, defendant Lydian Trust
11   Company directly or indirectly owned and controlled, or owns and controls, the affairs of
12   all three other Lydian defendants.

13        9.     Upon information and belief, all four Lydian defendants and their
14   predecessors and successors (collectively referred to herein as "Lydian") were at all
15   relevant times, under common ownership and control and acted in concert with each other
16   and as each other's alter egos in connection with the wrongful conduct that forms the
17   subject matter of this action.

18        10.    Upon information and belief, defendant City National Corporation is a
19   corporation duly organized and existing under the laws of the State of Delaware with its
20   principal place of business located at 400 N. Roxbury Drive, Beverly Hills, California
21   90210. Upon further information and belief based on recent public statements, City
22   National Corporation either has acquired or will soon acquire substantially all of the assets
23   of Lydian in what amounts to a *de facto* acquisition of Lydian, and will continue the
24   business of Lydian as Convergent Wealth Advisors. As a result, City National Corporation
25   either is or may be a legal successor in interest to Lydian. Although representatives of
26   Lydian have made oral representations that Lydian Trust Company has agreed to indemnify

COMPLAINT
Page 5

1  City National Corporation from and against any liability that it may incur in connection

2  with the claims asserted against the Lydian entities in this action, Lydian Trust Company

3  has refused to provide any written confirmation to representatives of the plaintiffs in this

4  action of its assumption of financial responsibility for the obligations and liabilities of the

5  Lydian entities it sold to City National Corporation, either based on its putative

6  indemnification agreement in favor of City National Corporation or based on its receipt of

7  all or substantially all the consideration for the assets of the Lydian entities that it caused to

8  be sold to City National Corporation.

9  **JURISDICTION AND VENUE**

10  11.      This Court has subject matter jurisdiction over this action pursuant to 28

11  U.S.C. § 1332 because this is a controversy between citizens of different states and the sum

12  or value of the matter in controversy exceeds $75,000.  Venue is proper in this judicial

13  district pursuant to 28 U.S.C. § 1391 because plaintiffs and defendants reside in this judicial

14  district and the claims asserted arose here.

15  **STATEMENT OF FACTS**

16  12.      Plaintiff Chris Larson was one of the first employees of Microsoft

17  Corporation, where he remained employed until 2001.  As a result of his long affiliation

18  with Microsoft, Larson and his wife, plaintiff Julia Calhoun, acquired a substantial quantity

19  of Microsoft common stock.

20  13.      At all relevant times, defendants have been in the business of, among other

21  things, providing investment and wealth-management advisory and consulting services to

22  high net worth individuals.  In numerous published articles written by (or at least attributed

23  to) Lydian's Director of Risk Management, Scott Welch, Lydian was described as "a

24  conflict-free wealth management firm [that] services high net worth individuals and

25  families."  In describing his services, Mr. Welch stated that, on behalf of defendants, he

26

COMPLAINT
Page 6

**YARMUTH WILSDON CALFO PLLC**

FOURTH & MADISON
925 FOURTH AVENUE, SUITE 2500
SEATTLE WASHINGTON 98104
T 206.516.3800  F 206.516.3888

1  "advises and consults with investors on hedging and other equity risk management

2  strategies."

3      14.    In or about May 2002, plaintiffs were introduced to Lydian through an

4  existing Lydian client who was a former colleague of Larson's. At initial meetings with

5  plaintiffs, Lydian represented itself as having substantial expertise in advising high net

6  worth individuals with respect to wealth-management issues, and, specifically, in assisting

7  high net worth individuals with negotiating loan terms and lending rates with banks and

8  brokerage firms that would be more favorable than such individuals could hope to obtain

9  without Lydian's assistance.

10     15.    Insofar as relevant to this proceeding, Larson advised Lydian's

11  representatives, including Steve Lockshin and Scott Welch, that plaintiffs wished to use a

12  portion of the Microsoft shares they owned as collateral for loans to finance other

13  investment opportunities; that they wished to accomplish the same investment objective in a

14  separate transaction involving a large block of shares they held in another company; that

15  they wished to do so in a manner that would enable them to have access to a greater amount

16  of collateralized borrowing than would be available under standard margin arrangements;

17  and that they wished to do so in a manner that was most tax-efficient. Larson emphasized

18  that plaintiffs remained bullish about Microsoft's future stock performance and,

19  accordingly, that they did not intend to sell their positions in Microsoft, but only wanted to

20  use the collateral borrowing power of the Microsoft stock more effectively than they had

21  done in the past. Demonstrating their intention to retain the Microsoft stock they intended

22  to use as collateral for a loan, plaintiffs did in fact retain such stock at the end of the loan

23  transactions at issue, and indeed still own it to this day.

24     16.    In response to Larson's description of plaintiffs' objectives, Lydian's

25  representatives advised him that defendants had substantial experience in advising high net

26  worth individuals having investment objectives identical to those articulated by Larson, and

COMPLAINT
Page 7

YARMUTH WILSON CALFO PLLC
FOURTH & MADISON
925 FOURTH AVENUE, SUITE 2500
SEATTLE WASHINGTON 98104
T 206.516.3800  F 206.516.3888

1    that investment of at least a portion of their Microsoft stock in a variable pre-paid forward

2    ("VPF") transaction would better achieve plaintiffs' objectives than other available

3    investment alternatives.  Until it was proposed to him by Lydian as the preferred investment

4    vehicle for achieving plaintiffs' stated objectives, Larson had never heard of a VPF

5    transaction.  In subsequently entering into the VPF transactions that form the subject matter

6    of this action, plaintiffs were therefore relying exclusively on Lydian's recommendation

7    and its claims of alleged expertise in designing and negotiating such transactions with

8    counterparty-banks.

9          17.    A VPF is an equity derivatives transaction between the owner of a stock,

10   such as the plaintiffs, and a financial institution.  In a typical VPF, the financial institution

11   pays the individual counterparty a cash advance equal to an agreed-upon discounted value

12   of the shares involved in the transaction.  The financial institution then buys a call option

13   from, and sells a put option to, the counterparty stock owner.  The stock owner retains all

14   the economic benefits and all the risk of a fluctuation in the stock price within the range of

15   market prices between the strike prices of the put and call options, which is referred to as

16   the "collar."  Because of the call option, the financial institution enjoys the benefit of stock-

17   price appreciation above the strike price of the call option, subject to any hedging

18   transactions the financial institution may enter into independent of the VPF.  Similarly,

19   because of the put option, the financial institution is also exposed to the risk of market-price

20   fluctuations below the strike price of the put option.  Typically, a counterparty financial

21   institution to a VPF will hedge its exposure to both sides of the equity collar through a

22   technique called delta-hedging.  Although the stock owner retains ownership of the stock,

23   the financial institution holds the shares as collateral security for the cash advance.

24         18.    At the trade's maturity (in this case three (3) years), the stock owner then

25   tenders either: (a) all or a portion (depending on the price of the stock at maturity) of the

26   shares held as collateral, which effectively constitutes a sale of those shares at that time; or

COMPLAINT
Page 8

1    (b) a cash payment sufficient to pay off the loan, which reflects the intention of investors
2    such as plaintiffs that the VPF transaction was a loan collateralized by the stock, and not a
3    deferred sale of the stock.

4        19.    The terms of the transaction, including the cash advance payment, the strike
5    prices for the put and call options and all other terms of a VPF transaction involve highly
6    complex calculations and the use of pricing models designed to enable both the stock owner
7    and the counterparty-bank to establish an after-tax risk/reward model that is acceptable to
8    each of them.  As such, each of these elements of a VPF transaction is the subject of highly
9    sophisticated and complex negotiation between them.  The combination of the sheer
10   complexity of evaluating the metrics of these transactions, the effect of changes in those
11   metrics on the after-tax risk/reward scenarios, and the potentially enormous costs associated
12   with even minor predictive or calculation errors, makes the task of negotiating and
13   evaluating the terms of a VPF well beyond the competence of even the most successful high
14   net worth individuals such as the plaintiffs in this case.  The arcane and highly specialized
15   nature of this area of significant investment opportunity and risk has created a concomitant
16   opportunity for financial advisers to render valuable consulting services to their clients.  It
17   has, regrettably, also enabled companies such as Lydian to pretend that they belong in the
18   community of trusted and highly valuable financial advisers and, in so doing, to charge
19   clients such as plaintiffs many millions of dollars in unearned fees and to cause them to lose
20   hundreds of millions more.

21   **Lydian's Advice Regarding The VPF Transactions**

22       20.    Lydian represented to plaintiffs that it had the expertise, experience, and
23   relationships in the industry generally, and with respect to VPF transactions specifically, to
24   design and negotiate a VPF transaction that would best achieve plaintiffs' stated investment
25   objectives on terms that were more favorable than could be secured by plaintiffs themselves
26   or by other investment advisors.  Lydian assured Larson that the selection of a financial

COMPLAINT
Page 9

YARMUTH WILSDON CALFO PLLC

FOURTH & MADISON
925 FOURTH AVENUE, SUITE 2500
SEATTLE WASHINGTON 98104
T 206.516.3800   F 206.516.3888

1    institution to act as the counterparty to the VPF transaction would be made through a
2    competitive bidding process that would be based on a Term Sheet to be designed and
3    prepared by Lydian that would reflect plaintiffs' objectives; and that Lydian would
4    carefully manage the bidding process, review all bids and recommend to plaintiffs the
5    financial institution that was prepared to enter in to a VPF transaction meeting all of their
6    objectives at the most competitive pricing. Lydian represented to Larson that it had the
7    competence, knowledge, expertise and experience to render all these advisory services.

8         21.    On the basis of all the representations made and all the assurances given by
9    Lydian, plaintiffs and Lydian entered into an oral agreement pursuant to which Lydian
10   agreed to render the advisory services described above in exchange for compensation to be
11   calculated as a percentage of the overall value of the transaction that was ultimately
12   consummated. For reasons best known to Lydian and its representatives, they never asked
13   plaintiffs to enter into a written agreement memorializing this investment advisory and
14   consulting relationship, and the parties' respective obligations under their agreement. The
15   only document that Lydian ever asked Larson to sign was a document entitled "Brokerage
16   Service Disclosure" relating solely to the ministerial function of actually making the trade
17   with the counterparty-bank. Although that document did acknowledge that CMS Financial
18   Services, Inc., an investment advisory company and the predecessor of Lydian Wealth
19   Management Company, "may have advised [Larson] relating to the appropriateness of this
20   transaction or similar transactions" for reasons known only to Lydian, its representatives
21   decided not to memorialize in a written document the nature and scope of their investment
22   advisory services and the representations on which plaintiffs had relied in engaging Lydian.

23        22.    Prior to and during the preparation of the Term Sheet, Larson and Lydian
24   discussed that Larson's objectives differed significantly from the objectives of most
25   investors in VPF transactions, which are to monetize the value of the investor's stock
26   holding at the highest possible loan amount, while deferring the actual sale and resulting

COMPLAINT
Page 10

YARMUTH WILSDON CALFO PLLC

FOURTH & MADISON
925 FOURTH AVENUE, SUITE 2500
SEATTLE WASHINGTON 98104
T 206.516.3800  F 206.516.3888

1    capital gains taxes for several years until the transaction's maturity, at which time the

2    securities would be sold. Larson and Lydian specifically discussed that plaintiffs'

3    objectives were markedly different in that they did not intend to sell their Microsoft shares

4    at the maturity of the transaction. Larson explained to Lydian that plaintiffs remained

5    bullish on Microsoft stock, and wanted to retain all the economic incidents of ownership

6    (which clearly included, among other things, the receipt of any dividends that might be

7    declared and the economic benefit of appreciation in the stock price (up to the strike price

8    of the call option)).

9        23.     The terms of the VPF transaction described on the Term Sheet prepared by

10    Lydian reflected this fundamental difference between plaintiffs' objectives (securing

11    favorable terms for a loan) and those of the typical VPF investor (monetizing their

12    investment and deferring the sale of the underlying stock and the resulting capital gain). In

13    plaintiffs' VPF transactions, the strike price of the call option was set at 1.5 times the then-

14    current price of Microsoft, whereas VPF trades typically set the call strike at a significantly

15    lower level, *e.g.*, 1.2 times the then-current stock price. Plaintiffs wanted the unusually

16    high call strike specifically because they believed that Microsoft stock would appreciate in

17    price, and they wanted to retain the right to benefit from that price appreciation within a

18    much larger range than is customary in VPF transactions. Also reflecting plaintiffs'

19    bullishness on Microsoft, Plaintiffs were similarly willing to accept a lower downside strike

20    price on the put than is customary in VPF transactions, (0.80 of the then-current stock price,

21    compared to a more typical 0.90 or, according to Welch, even 1.00). This lower than usual

22    strike price on the put option would have the effect of exposing plaintiffs to significantly

23    greater downside risk than is customary in VPF transactions. As a result, the width of the

24    "collar" of the VPFs that plaintiffs sought was far broader than a typical VPF transaction:

25    80% - 150% versus the more customary 90% (or 100%) to 120% of the then-current price

26    of Microsoft.

COMPLAINT
Page 11

YARMUTH WILSDON CALFO PLLC
FOURTH & MADISON
925 FOURTH AVENUE, SUITE 2500
SEATTLE WASHINGTON 98104
T 206.516.3800  F 206.516.3888

24. The greater continuing investment risk resulting from plaintiffs' broader than usual VPF "collar" also had the effect of reducing the amount that plaintiffs could borrow based on the Microsoft stock they pledged as collateral for the loan. The far wider "spread" between the strike prices of the put and the call of plaintiffs' VPF Transactions, and consequent lower advance amounts, reflected their bullishness about the stock and their stated objectives that they did not intend to sell the Microsoft stock at maturity, but only wished to use it as collateral for borrowing. Insofar as particularly relevant to the circumstances that spawned this dispute, this structure reflected plaintiffs' stated investment objectives that they wished to retain all the economic incidents of ownership during the term of the transaction since they always intended to retain, and not sell, the Microsoft stock when the transaction matured. Indeed, true to their stated intentions, plaintiffs still own the subject Microsoft stock today.

25. In order for plaintiffs to retain as many incidents of ownership over the collateral stock as possible, Lydian recommended, and negotiated on plaintiffs' behalf, that dividends were to be paid directly to plaintiffs. To reflect that understanding, the Term Sheet setting forth plaintiffs' specific requirements (copy annexed as Exhibit 1, the "Term Sheet") clearly stated, in relevant part:

> Dividends. Client [plaintiffs] retains all ordinary dividends, bank can re-adjust hedge economics in the event of a change in dividend policy.

The second part of the quoted language prepared by Lydian evidenced its and plaintiffs' recognition that unanticipated dividend payments would affect the overall economics of the transaction because such payments have the necessary effect of decreasing the asset value of company, and therefore that there would be a need to readjust the terms of the Transactions in the event that Microsoft were to begin paying dividends. However, the Term Sheet also made clear that any such adjustments should not affect the underlying

COMPLAINT
Page 12

economics of the deal. To reflect this, the Term Sheet prepared by Lydian and approved by Larson was quite specific in providing as follows:

> Adjustments/Determinations. Trade Confirmation will contain language that [] specifies that **all adjustments will be made so as to maintain the economics of the initial trade for both parties . . . .** (emphasis added).

26. Thus, according to the Term Sheet that Lydian prepared, any transaction that plaintiffs would enter was required to provide that, in the event Microsoft were to issue any dividends, plaintiffs would receive those dividends, and that any adjustments to the metrics of the transactions to reflect those dividend payments would be limited so as "maintain the economics of the initial trade for both parties."

27. By email dated June 10, 2002, Scott Welch of Lydian confirmed that he sent the Term Sheet to potential counterparty-banks as the basis upon which to submit bids for the transactions.

28. Over the next few days, bids were submitted by approximately ten banks. Lydian undertook to review those bids for conformity with the Term Sheet and to advise Larson of the bank that had offered the most competitive terms. As a result of that review, Lydian identified one financial institution that Lydian represented had submitted the most competitive bid in response to the Term Sheet, which also happened to be the same financial institution that Lydian had predicted would win the process. On that basis, that financial institution was invited to submit contract documents to memorialize the terms of the transactions.

29. The contract submitted to and reviewed by Lydian was based on another contract that Lydian had previously negotiated extensively on behalf of another of its clients. Thus, the contract that became the plaintiffs' VPF contract was not only reviewed and negotiated by Lydian, purportedly on plaintiffs' behalf, but also purported to reflect Lydian's allegedly extensive experience and expertise with VPF transactions.

COMPLAINT
Page 13

30.    On June 14, 2002, Lydian advised Larson that it had reviewed the underlying contract documents proposed by the successful bidder, and Lydian gave plaintiffs the following assurance:

> . . . [T]he contracts reflect and incorporate all of the terms and conditions that we laid out in the pricing Term Sheet (emphasis added).

31.    Lydian thus specifically and unequivocally assured plaintiffs that the agreement it was recommending satisfied **all** the provisions of the Term Sheet. Given that plaintiffs had never before even heard of a VPF transaction, they justifiably relied on Lydian's investment advice and claimed expertise. On that basis, plaintiffs executed the documents with the counterparty-bank and proceeded with the Transactions. Specifically, relying on Lydian's recommendations and assurances, plaintiffs entered into a Stock Purchase Agreement and executed two separate VPFs on their subject shares of Microsoft on or about June 14, 2002 (the "Transactions"). Lydian was paid a fee of $1,265,595 for its advice and asserted expertise in connection with these Transactions.

32.    Further, in November 2002, plaintiffs executed a second set of VPF transactions through Lydian for another stock, upon which Lydian was paid another consulting fee, this in the amount of $1,044,057.

33.    Subsequent events, described more fully below, revealed that Lydian's representations and assurances as to its competence, experience and expertise were false, and that its agreement to provide competent investment advisory consulting services to plaintiffs was illusory.

### Performance Under The Transactions Recommended By Lydian

34.    In January 2003, Microsoft announced that it would pay a one-time dividend of $0.08 per share. Microsoft went ex-dividend on February 19, 2003 at a price of $24.82 per share. By e-mail dated February 24, 2003, Scott Welch explained--and approved of-- the adjustment the counterparty-bank had indicated it would make to the VPF Transactions.

COMPLAINT
Page 14

YARMUTH WILSON CALFO PLLC
FOURTH & MADISON
925 FOURTH AVENUE, SUITE 2500
SEATTLE WASHINGTON 98104
T 206.516.3800   F 206.516.3888

1    Specifically, Welch confirmed that plaintiffs would retain the $0.08 per share dividend, and
2    the bank would "adjust" the collar by reducing the strike price of the call from $41.427 per
3    share to $40.6391 per share, for a reduction of approximately $0.79 per share.
4    Unbeknownst to plaintiffs at the time, an "adjustment" taking $0.79 of the potential value
5    of the Transactions represented a reduction of the call strike price of **approximately five**
6    **times more** than was necessary "to maintain the economics of the initial trade for both
7    parties" in response to Microsoft's $0.08 dividend. Nevertheless, in that same February 24,
8    2003 e-mail, Welch advised Larson that this adjustment was consistent with the Term Sheet
9    because, according to Welch, "**[e]conomically, your position has not changed.**"
10   (emphasis added). But, in fact, as plaintiffs later discovered, their economic position had
11   changed dramatically, and Lydian's assurance to the contrary was the product of its gross
12   negligence and ignorance as to the underlying economics of the VPF Transactions as to
13   which it had professed to have competence and expertise.

14       35.    On or about March 7, 2003, Microsoft paid the ordinary dividend of $0.08
15   per share, and the counterparty-bank gave notice of an adjustment to plaintiffs' VPF
16   Transactions of reducing the strike price on the call option by approximately $0.79 per
17   share. Thus, although the actual cash dividend was $0.08 per share, the counterparty-bank
18   claimed that the terms of the Transactions negotiated by Lydian allowed it to lower the
19   strike price of the call option collar by approximately $0.79--or nearly ten times the value
20   of the dividend being issued. This dramatic reduction in the strike price of the call option
21   collars would have had the immediate and irrevocable result of eliminating plaintiffs'
22   opportunity to enjoy $0.79 of the upside opportunity of an increase in the price of Microsoft
23   stock. As noted above, notwithstanding this enormous disequilibrium between event and
24   result, Lydian advised Larson that his "position had not changed" economically.

25       36.    When Larson received the Notice of Adjustment from the counterparty-bank
26   and its request for plaintiffs' signature to evidence their approval of that adjustment,

COMPLAINT
Page 15

**YARMUTH WILSDON CALFO PLLC**

1    something seemed illogical about this, but because he lacked the knowledge and expertise

2    of the investment advisor that had just been paid a fee of more than $1.2 million for the

3    Microsoft VPF, Larson turned back to Lydian for advice. On August 30, 2003, Larson

4    advised Lydian's Brian Vowinkel, as well as Scott Welch, that "I cannot sign these

5    documents without some sort of explanation of the calculations used to come up with the

6    new numbers. I look forward to being educated."

7         37.    On September 2, 2003, Lydian's Scott Welch responded to Larson's inquiry

8    by again reassuring him that the adjustment had been economically neutral. Welch began

9    his explanation by acknowledging the requirement that any adjustments must be

10    economically neutral. He stated:

11
12
13
> **The premise behind any adjustment is to maintain the original economic results for both parties -- buyer and seller. This was explicitly negotiated in your contract.** (emphasis in original)

14    Welch then attempted to explain the basis for his continuing assurances to plaintiffs that the

15    adjustment methodology that had been used by the counterparty-bank was indeed

16    economically neutral. Welch concluded by vouching not only for the adjustment

17    methodology used by the counterparty-bank, but by vouching for the counterparty-bank

18    itself. Welch stated:

19
20
21
22
23
24
25
26
> I've been through this process with [the counterparty-bank] several times on other stocks -- **they make their adjustments straight up and with no additional benefit to them.** As further evidence of this, [the counterparty-bank] is completely indifferent as to which "side" of this adjustment you wish to take – you can sign the amendments as drafted and [the counterparty-bank] will (a) release your dividends to you and (b) reduce the call strike as indicated; OR you can allow [the counterparty-bank] to keep your dividends and they will maintain the original put and call strike values. I don't recommend this, since it would require yet another amendment to the contract (one which should be reviewed by your tax counsel, since it changes one of the fundamental issues of the original contract), but **the fact that [the**

COMPLAINT
Page 16

YARMUTH WILSDON CALFO PLLC

FOURTH & MADISON
925 FOURTH AVENUE, SUITE 2500
SEATTLE WASHINGTON 98104
T 206.516.3800  F 206.516.3888

**counterparty-bank] is indifferent as to which "side" of the deal it ends up with is, to me, a pretty strong indication that the adjustments have been made in good faith and in such as way as to accrue no additional benefit to either party in the deal (which is exactly what we negotiated in the original contracts)** (emphasis added).

38.     Despite these false assurances from Lydian, Larson was quite concerned about the draconian effect of this "adjustment" on the economics of the deal, even though Lydian continued to represent that the adjustment conformed to the Term Sheet. Based on this concern, plaintiffs refused to consent to what appeared to be a grab of nearly ten times the value of the dividend being issued. However, as a result, plaintiffs were never paid the actual cash dividend of $0.08 per share on the shares involved in the Transactions that they were entitled to pursuant to the Transactions negotiated by Lydian on their behalf.

39.     Once he came to understand that Lydian's above-quoted justifications of the proposed purportedly neutral adjustments were simply dead wrong and either intentionally misleading or the result of gross ignorance, Larson suggested an alternate way to handle the adjustment that would protect the counterparty-bank's collateral (*i.e.*, preserve the neutrality of the original Transactions) without depriving Plaintiffs of ten times the amount of upside opportunity as the amount of the dividend they received and approximately five times the amount actually necessary "to maintain the economics of the initial trade for both parties." As Larson put it at one point, "God forbid if Microsoft were to declare a $1.00 dividend" because use of that same methodology would cost plaintiffs $10 per share of upside potential--or more than $100 million dollars on the shares that formed the collateral for the Transactions. It was that concern that led plaintiffs to explore--and ultimately enter into -- an amendment to the VPF Transactions.

40.     Larson suggested to Lydian that the VPF contracts be revised to provide for the dividend payments to be placed in escrow in order to protect the legitimate interest of the counterparty-bank in not having its collateral protection eroded as the result of the

COMPLAINT
Page 17

1  dividend payment and the concomitant reduction in the value of Microsoft that occurs upon

2  dividend issuance. Such a change would have made the contract economically neutral with

3  respect to the dividend adjustment (*i.e.*, it would have preserved the pre-dividend value of

4  the Transactions for all parties). This result, which was required by the Term Sheet and

5  reflected plaintiffs' requirements, should have been permissible under the Transaction

6  documents if the written assurance of "economic neutrality" that Lydian had given to

7  plaintiffs before they signed those documents had been accurate. Lydian's Welch

8  responded by e-mail dated September 23, 2003, copies of which were sent to other Lydian

9  representatives Lockshin, Vowinkel and McKinley. Lydian advised Larson that the

10  counterparty-bank would not consider the escrow approach, but:

> What [the bank] ha[s] offered to do **- an offer that I
> consider strong evidence that the adjustments have
> been made fairly -** is to amend the contract **so that
> [the bank] retains all ordinary dividends paid by
> Microsoft and, in turn, leaves your put and call
> strike prices unchanged.** In other words, they are
> giving you the choice to pick which "side" of the
> adjustment you want. [The bank's] indifference as to
> which side it ends up with gives me confidence that
> the adjustment was made with no marginal benefit to
> either party - a point that was explicitly negotiated in
> your trade documents (emphasis added).

18  41.   In retrospect, it became clear that Lydian still did not understand the

19  economics of the Transactions in which it purported to be an expert. At the time, however,

20  relying on this advice from Lydian's Welch--and unwilling to expose themselves to the

21  elimination of more than $100 million in potential upside (assuming a $1.00 dividend),

22  plaintiffs elected to enter into an Amended Agreement dated as of October 24, 2003.

23  42.   Pursuant to the Amended Agreement, plaintiffs were forced to surrender

24  their right to receive cash dividend payments made by Microsoft during the term of the

25  Transactions in order to avoid the draconian imposition of dividend adjustments that would

26

COMPLAINT
Page 18

YARMUTH WILSDON CALFO PLLC
FOURTH & MADISON
925 FOURTH AVENUE, SUITE 2500
SEATTLE WASHINGTON 98104
T 206.516.3800 F 206.516.3888

1    have removed the benefit of a ten-fold multiple of that amount in upside potential for the
2    stock about which they were still bullish.

3         43.    According to Lydian's continuing assurances, the Amended Agreement was
4    a fair trade that reflected the Term Sheet's stated objective to preserve the economic
5    neutrality of the Transactions. As with all of Lydian's prior assurances, subsequent events
6    demonstrated that these assurances were simply the product of gross negligence and
7    ignorance of the Transactions' economics on Lydian's part. However, in order to extricate
8    themselves from the far worse situation that Lydian's original advice had put them in
9    (allowing one-sided "adjustments" that would have effectively transferred much of the
10   value of the Transactions from plaintiffs to the counterparty-bank), plaintiffs were forced to
11   accept the lesser evil of surrendering their right to receive ordinary dividends, which had
12   also been a key component of the Term Sheet and original Transactions recommended by
13   Lydian. Although making this Hobbesian choice prevented Lydian's misrepresentations
14   from damaging plaintiffs even more when Microsoft later announced an extraordinary
15   dividend of $3 per share, plaintiffs were still forced to surrender their right to each of seven
16   ordinary dividend payments, in the aggregate amount of $0.56 per share during the
17   remaining term of the Transactions.

18   **Lydian Finally Sees The Light**

19        44.    Finally, more than two (2) years after the Transactions had been entered into
20   based on Lydian's advice--advice for which Lydian was paid $1,265,595 for these
21   Transactions and $1,044,057 on a second set of VPF transactions--Lydian finally realized,
22   or at least finally admitted, that it did not understand these VPF Transactions at all. By
23   email dated August 24, 2004, Welch admitted that Lydian had really contributed nothing of
24   value to plaintiffs in connection with the VPF Transactions because Lydian lacked both
25   trading experience and any ability whatever to test the accuracy of the counterparty-bank's
26   calculations. Welch admitted, in essence, that in exchange for aggregate fees of

COMPLAINT
Page 19

YARMUTH WILSDON CALFO PLLC
FOURTH & MADISON
925 FOURTH AVENUE, SUITE 2500
SEATTLE WASHINGTON 98104
T 206.516.3800   F 206.516.3888

1     $2,309,652, Lydian's representatives had done absolutely <u>nothing</u> other than "accept at face

2     value" everything the counterparty-bank told them.  Welch finally admitted:

> **What I do not have are pricing models, because
> that is not the nature of our business.  Neither do I
> have trading experience.** These factors, combined
> with a generally positive professional relationship
> with [the counterparty-bank] for six years, **resulted in
> me accepting at face value what they told me with
> respect to your transaction and "market
> standards."**  (emphasis added).

### FIRST CLAIM
### (Breach of Contract)

9     45.     Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1-44

10    above as fully and completely as if set forth herein.

11     46.     Lydian and plaintiffs agreed that Lydian would act as Plaintiffs' investment

12    advisor, agent and broker with respect to VPF transactions.

13     47.     Lydian represented, warranted and covenanted to plaintiffs that it had the

14    ability and expertise to provide, and that, in exchange for the payment of aggregate fees of

15    $2,309,652, it would provide sophisticated financial advice in connection with the

16    negotiation and performance of plaintiffs' VPF Transactions.

17     48.     Lydian breached its obligations under the agreement with plaintiffs.  Instead

18    of providing independent sophisticated investment advice, Lydian finally admitted that its

19    designated representatives actually had no trading experience at all, and that they had none

20    of pricing models that are essential to the determination of the metrics of the VPF

21    transactions at issue, metrics that were absolutely essential in order to ensure that plaintiffs'

22    objectives and after-tax risk/reward parameters were satisfied.  Rather than providing the

23    investment advisory services they had contracted to provide, and for which it was paid,

24    Lydian merely "accept[ed] at face value" what it was told by the counterparty-bank.

COMPLAINT
Page 20

YARMUTH WILSDON CALFO PLLC

FOURTH & MADISON
925 FOURTH AVENUE, SUITE 2500
SEATTLE WASHINGTON 98104
T 206.516.3800  F 206.516.3888

49.     Plaintiffs fully and faithfully performed their own obligations under their agreement, including without limitation causing the timely payment to Lydian of the bargained-for compensation of $2,309,652.

50.     By reason of the foregoing, plaintiffs have suffered damages in an amount to be determined in this proceeding, but believed to be no less that $9,589,652.

### SECOND CLAIM
### (Negligent Misrepresentation)

51.     Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1-50 above as fully and completely as if set forth herein.

52.     Lydian owed a duty to plaintiffs to make accurate and truthful statements about whether they had the competence, experience and expertise to advise them about investment vehicles that could achieve the objectives Larson described to them, which was to take out a loan on the most favorable terms possible, using their Microsoft stock as collateral. The standard of care owed by Lydian to plaintiffs included, without limitation, the obligations imposed on it as a matter of common law and, as well, the obligations imposed on it by Section 206 of the Investment Advisors Act of 1940, 15 U.S.C. § 80b-6, which prohibited Lydian: "(1) to employ any device, scheme, or artifice to defraud any client or prospective client; (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client; . . . (4) to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative."

53.     During the course of the parties' commercial relationship, Lydian negligently and falsely misrepresented that they possessed the required competence, experience and expertise to advise and represent plaintiffs with respect to VPF transactions.

54.     By way of example, and not intending to be exhaustive, Lydian's misrepresentations included the following:

- That Lydian had the expertise to provide plaintiffs with competent advice as to the investment vehicles that could meet plaintiffs' objectives described above.

COMPLAINT
Page 21

YARMUTH WILSDON CALFO PLLC

FOURTH & MADISON
925 FOURTH AVENUE, SUITE 2500
SEATTLE WASHINGTON 98104
T 206.516.3800  F 206.516.3888

- That Lydian would design and prepare a Term Sheet that would include all the elements needed to protect plaintiffs' interests, and then negotiate the terms of transaction documents that would reflect those investment objectives.

- That the VPF Transactions ultimately recommended by Lydian would meet all the requirements of the Term Sheet, including those relating to the issuance of dividends and any adjustments to the terms of the Transactions required thereby.

- That the original contract and Amended Agreement proposed by the counterparty-bank actually did meet the requirements of the Term Sheet.

- That the counterparty-bank's adjustment to the call strike price of Plaintiffs' VPF Transactions, removing $0.79 of the Transactions' value in response to issuance of a $.08 dividend, did not economically change plaintiffs' position with respect to the Transactions.

- That such adjustment did, in fact, maintain the economics of the initial trade for both plaintiffs and the counterparty-bank.

- That the terms of the Amended Agreements, which permitted the counterparty-bank to retain all ordinary dividends did, in fact, maintain the economics of the initial trade for both plaintiffs and the counterparty-bank.

- That Lydian would provide an independent analysis of the financial terms proposed by the counterparty-bank it had recommended to plaintiffs, rather than merely accept those terms "at face value," with no independent analysis.

55.     These misrepresentations had the foreseeable effect of causing plaintiffs to enter into agreements with the counterparty bank and to retain their positions in the Transactions even though, contrary to Lydian's representations, such Transactions did not meet the required terms of the Term Sheet.

56.     Defendants' misrepresentations to plaintiffs were, at a minimum, reckless and grossly negligent in that they were a predictable consequence of the lack of expertise and experience that Lydian ultimately admitted.

57.     By virtue of their misrepresentations alleged herein, Lydian breached the duties imposed on it by applicable legal standards.

COMPLAINT
Page 22

YARMUTH WILSDON CALFO PLLC

FOURTH & MADISON
925 FOURTH AVENUE, SUITE 2500
SEATTLE WASHINGTON 98104
T 206.516.3800  F 206.516.3888

58.   By reason of the foregoing, plaintiffs have suffered injury and damages in an amount to be determined in this proceeding, but believed to be no less than $9,589,652.

### THIRD CLAIM
### Breach of Fiduciary Duty

59.   Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1-58 above as fully and completely as if set forth herein.

60.   As plaintiffs' financial and investment advisor and agent, Lydian occupied a position of trust and owed plaintiffs a fiduciary duty, both as a matter of common law and pursuant to the Investment Advisors Act of 1940.

61.   Lydian breached the fiduciary duty it owed to plaintiffs in the many respects discussed above.  In addition, as plaintiffs subsequently learned from a review of allegations made against Lydian in an unrelated legal proceeding, Lydian had a previous "consulting" relationship with the counterparty-bank it chose for these Transactions, which it never disclosed to plaintiffs.  Further investigation in this proceeding may reveal that Lydian "steered" plaintiffs to that bank even though it knew that the Transaction documents did not conform to plaintiffs' requirements, as specifically set forth in the Term Sheet.

62.   By reason of the foregoing, plaintiffs have suffered injury and damages in an amount to be determined in this proceeding, but believed to be no less that $9,589,652.  If it is determined that Lydian's conduct was the result of an undisclosed conflict of interest with the counterparty bank, Lydian should also be required to pay plaintiffs exemplary and punitive damages in an amount not less than $10 million, or approximately five times the amount of the consulting fees they received in connection with their representation of plaintiffs.

### FOURTH CLAIM
### Professional Malpractice/Negligence

63.   Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1-62 above as fully and completely as if set forth herein.

COMPLAINT
Page 23

YARMUTH WILSDON CALFO PLLC
FOURTH & MADISON
925 FOURTH AVENUE, SUITE 2500
SEATTLE WASHINGTON 98104
T 206.516.3600   F 206.516.3888

1    64.    As a financial advisor, agent, and broker, Lydian had an obligation to

2    competently render services to plaintiffs and to act in accordance with the established

3    standard of care for professional financial advisors. Lydian was, in fact, obligated to render

4    services that met a heightened standard of care for financial advisors and brokers because

5    they held themselves out as sophisticated investment advisors with specialized capabilities

6    that could provide services and expertise not offered by others in the profession.

7    65.    Lydian committed professional malpractice and acted negligently in failing

8    to competently advise plaintiffs with respect to the transactions that form the subject matter

9    of this proceeding.

10    66.    Lydian's advice and assistance fell below the ordinary standard of care

11    required of a reasonable financial and investment advisor and fell woefully below the level

12    of care that was promised and expected given Lydian's self-proclaimed expertise and

13    specialized skills and knowledge. Lydian's advice and assistance also fell well below the

14    standard of care imposed on it pursuant to Section 206 of the Investment Advisors Act of

15    1940 and other applicable law.

16    67.    Lydian's negligence and malpractice were a proximate cause of plaintiffs'

17    suffering injury and damages in an amount to be determined in this proceeding, but

18    believed to be no less that $9,589,652.

19    //

20    //

21    //

22    //

23    //

24    //

25    //

26    //

COMPLAINT
Page 24

YARMUTH WILSDON CALFO PLLC
FOURTH & MADISON
925 FOURTH AVENUE, SUITE 2500
SEATTLE WASHINGTON 98104
T 206.516.3800   F 206.516.3888

1  |  **PRAYER FOR RELIEF**

2  |  **WHEREFORE** plaintiffs respectfully ask that Judgment be entered in their favor

3  |  and against all defendants, jointly and severally:  (a) for compensatory damages in an

4  |  amount to be proven during this proceeding, but believed to be no less than $9,589,652;

5  |  plus (b) pre-judgment interest accruing at the statutory rate from the date of defendants'

6  |  wrongdoing; plus (c) plaintiffs' costs, expenses, reasonable attorneys' fees and such other

7  |  further and different relief as the Court deems to be just and proper.

8

9  |  Dated: June 7, 2007        YARMUTH WILSDON CALFO PLLC

10

11 |  By: _____
    Jeremy E. Roller, WSBA No. 32021

12 |  Fourth & Madison
    925 Fourth Avenue, Suite 2500

13 |  Seattle, WA 98104
    Telephone: (206) 516-3800

14 |  Fax: (206) 516-3888
    Email: jroller@yarmuth.com

15

16 |  PILIERO GOLDSTEIN KOGAN &
    MILLER, LLP

17

18 |  Robert D. Piliero*
    Richard B. Brosnick*

19 |  10 East 53rd Street
    New York, NY  10022

20 |  Telephone: (212) 478-8500
    Fax: (212) 478-8584

21 |  Email: rpiliero@pgkm.com
           rbrosnick@pgkm.com

22 |  *pro hac vice applications to be filed

23 |  Attorneys for Plaintiffs Christopher Larson
    and Julia Calhoun

24

25

26

COMPLAINT
Page 25